**Lana J. SNYDER, Plaintiff,**

v.

**Kenneth S. APFEL,[1] Commissioner of Social Security, Defendant.**

**No. 4–96–CV–90883.**

United States District Court,
S.D. Iowa,
Central Division.

Dec. 1, 1997.

1. President Clinton appointed Kenneth S. Apfel to serve as Acting Commissioner of Social Security, effective September, 29, 1997, to succeed John J. Callahan. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Kenneth S. Apfel is hereby substituted for John J. Callahan as defendant in this action.

William C. Purdy, Asst. U.S. Atty., Des Moines, IA, for Defendant.

David S. Wiggins, West Des Moines, IA, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Plaintiff, Lana J. Snyder, filed a Complaint in this court on December 23, 1996, seeking review of the Commissioner's decision to deny her claim for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 (1994). This court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is affirmed.

## BACKGROUND

Plaintiff filed an application for disability benefits on March 18, 1993[2]. Her application was denied initially and upon reconsideration. After a hearing, Administrative Law Judge John P. Johnson (ALJ) issued a decision on July 27, 1995, denying benefits. On October 24, 1996, the Appeals Council denied Plaintiff's request for review. Plaintiff filed this Complaint on December 23, 1996.

## STANDARD OF REVIEW

When reviewing a denial of benefits, we will uphold the Secretary's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Whitehouse v. Sullivan,* 949 F.2d 1005, 1006 (8th Cir.1991). Substantial evidence is that which a reasonable mind might accept as adequate to support the Secretary's conclusion. *Whitehouse,* 949 F.2d at 1006 (Citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). In assessing the sub-stantiality of the evidence, we must consid-

---

**2.** Plaintiff filed earlier applications on June 28, 1990, and May 27, 1992. The ALJ declined to reopen these applications.

er evidence that detracts from the Secretary's decision as well as evidence that supports it. *Locher,* 968 F.2d at 727 (citing *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir.1984)). We may not, however, reverse the Secretary's decision "merely because substantial evidence would have supported an opposite decision." *Id.* (quoting *Baker,* 730 F.2d at 1150). *Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993). In making this inquiry, a court should neither consider a claim de novo nor abdicate it's function to carefully analyze the entire record. *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

## ALJ'S FINDINGS

Plaintiff last met the earnings requirement of the Act at the end of December, 1996. Tr. at 144. That is to say, Plaintiff must prove that she became disabled on or before that date. *Grebenick v. Chater,* 121 F.3d 1193, 1196 (8th Cir.1997). The ALJ, following the sequential evaluation found at 20 C.F.R. § 404.1520, found, at the first step, that Plaintiff has not engaged in substantial gainful activity since November 17, 1992. At the second step, the ALJ found that Plaintiff has severe impairments: neck, shoulder, arm and knee pain; atypical chest pain; headaches; chronic gastritis; and a history of anxiety and depression. At the third step, the ALJ found that none of Plaintiff s impairments are severe enough to meet or equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found that Plaintiff has the residual functional capacity to perform a wide range of sedentary work and a limited range of light work. At the fourth step, the ALJ found that Plaintiff is unable to do her past relevant work as a registered nurse. Tr. at 24. At the fifth step, the ALJ found that there are other jobs in the national economy for which Plaintiff has the residual functional capacity. Tr. at 25.

## DISCUSSION

It is well settled 8th Circuit case law that, having found Plaintiff unable to do her past relevant work, the burden of proof shifted to the Commissioner to come forward with medical evidence to prove Plaintiff has a residual functional capacity for other work, and that other work exists in significant numbers in the national economy that such a person is able to do. *McCoy v. Schweiker,* 683 F.2d 1138, 1146–47 (8th Cir.1982) (en banc); *O'Leary v. Schweiker,* 710 F.2d 1334, 1338 (8th Cir.1983); *Soth v. Shalala,* 827 F.Supp. 1415, 1417 (S.D.Iowa 1993). See also *Davis v. Callahan,* 985 F.Supp. 913 (S.D.Iowa 1997) and cases cited therein. It is also well settled law that in order to meet the second prong of the Commissioner's burden, in cases where referral to the medical vocational guidelines (Grid) is inappropriate, the ALJ must rely on the testimony of a vocational expert in response to a hypothetical question which precisely sets out the claimant's impairments and limitations. *Ness v. Sullivan,* 904 F.2d 432, 436 (8th Cir.1990).

In the case sub judice, the ALJ found that Plaintiff is unable to do her past relevant work. The burden, therefore, was on the Commissioner to prove with medical evidence that Plaintiff has the residual functional capacity to perform work that exists in significant numbers in the national economy. The ALJ found that Plaintiff has the residual functional capacity for a wide range of sedentary work and a limited range of light work. Tr. at 24. At the hearing, the ALJ asked the following hypothetical question:

My first assumption is that we have an individual who's currently 44 years old, she will be 45 years old as of June 11 and was 42 years old as of the alleged onset date of disability; she's a female; she has a high school education plus additional training resulting in a designation of registered nurse; and she has past relevant work as a registered nurse and as a nurse supervisor; and she has the following impairments: she has medically determinable impairments resulting in complaint of pain of the neck, shoulders, arms, and left knee; history of atypical chest pain and headaches; chronic gastritis; and a history of anxiety and she has the physical—or residual functional capacity to perform work related activities except for lifting of no more than ten to 15 pounds; with standing

of no more than one hour at a time and no more than two to three hours out of an eight hour day; sitting of no more than an hour at a time and no more than five to six hours out of an eight hour day; and standing of no more than a half hour at a time and no more than one to two hours out of an eight hour day; with no repetitive bending, stooping, squatting, kneeling or crawling; no rapid—repetitive rapid turning of the head; no repetitive climbing; no repetitive work with the arms above the shoulder level; and this individual should not work at unprotected heights;

■ Tr. at 100. In response, the vocational expert testified that Plaintiff would not be able to do any of her past work, and that none of her skills would transfer to other jobs. The vocational expert testified that there would be several jobs in the national economy that Plaintiff would be able to perform. Tr. at 101. The issue for the Court to decide, therefore, is whether there is medical evidence in the record to support the hypothetical and the finding made by the ALJ. As stated above, the Court must take into account, and evaluate, the evidence which supports, as well as that which detracts from, the finding of the ALJ.

There is a great deal of medical evidence in this record which predates Plaintiff's onset of disability. Although all of the evidence has been reviewed and considered by the Court, the Court will only discuss that which is relevant to this decision. Plaintiff claims that she became unable to work November 17, 1992. Tr. at 140. Plaintiff has a long history of neck and shoulder pain. When she was 16 years old, Plaintiff was in a car accident and suffered a fracture and severe dislocation at the C5–6 area of her neck. She was in a second car accident in the Fall of 1986 when she was rear-ended. Tr. at 298. Plaintiff was in another car accident in 1990 when she injured her left knee. A car accident in 1992, caused increasing symptoms in her neck as well as her left knee. Tr. at 445.

Plaintiff's treating physician is John H. Ghrist, II, M.D. Dr. Ghrist saw Plaintiff on November 30, 1992. Tr. at 373–374. Examination of Plaintiff's neck revealed marked

muscle tension in the post cervical muscles, but her back showed no other abnormalities. Tr. at 373. Dr. Ghrist's impression included: "Chronic musculoskeletal problems with chronic cervical myofascial severe pain." Tr. at 374.

On April 1, 1993, Dr. Ghrist wrote a letter to Disability Determination Services. Tr. at 354. Therein, Dr. Ghrist wrote:

Ms. Snyder's chronic symptomatology is felt to be permanent, due to its chronic and prolonged past course. She is presently not lifting or carrying objects over approximately ten pounds. Prolonged walking, standing and even sitting, are performed on a very limited basis. She does no significant stooping, climbing, or crawling, and often suffers a mild fall with even simple bending over. No recent repeat evaluation has been done, with only a CAT scan and MRI in the distant past performed.

On March 8, 1993, Plaintiff's post trapezius muscles revealed marked subjective tenderness but were only mildly tight to actual palpation. Tr. at 375.

Plaintiff was seen on October 19, 1993 for an orthopaedic examination by Joe F. Fellows, M.D. at the request of Dr. Ghrist. On examination, Plaintiff's neck appeared clinically straight. She had no significant muscle spasm in the base of her neck. Range of motion of the neck was 35 degrees flexion and 30 degrees extension and side bending was normal. The neurological exam of Plaintiff's upper extremities was within normal limits. There was mild tenderness in the paravertebral muscles in the middorsal region of the back. There was good range of motion in the lower back and straight leg tests were negative. Tr. at 445. When Plaintiff was seen by Dr. Fellows on November 30, 1993, her major complaints were pain in her left knee and low back. Dr. Fellows recommended an MRI and x-ray. On December 15, 1993, the studies of the thoracic and lumbar spine were reported normal. Tr. at 447. On December 17, Dr. Fellows wrote that an MRI of Plaintiff's left knee showed a meniscal cyst and a small popliteal cyst but no definite tear. Tr. at 448.

On December 17, 1993, Plaintiff saw Steven D. Waldman, M.D. at The Headache and Pain Center in Leawood, Kansas, for persistent neck and bilateral shoulder pain. Dr. Waldman wrote: "In view of her past excellent response to cervical epidural blocks, we are going to re-implement this therapy." Tr. at 458. Plaintiff underwent a series of epidural injections between December 17, 1993 and January 7, 1994. Tr. at 511 – 523.

On April 18, 1994, Dr. Ghrist wrote that Plaintiff had been advised not to lift anything over 10–15 pounds and to avoid prolonged activity such as stooping, climbing, and kneeling. Frequent changes in position were recommended. Tr. at 472.

The ALJ remanded the case for consideration of a possible mental impairment on March 1, 1994. Tr. at 410–416. At the request of Disability Determination Services, Plaintiff saw Michael J. Taylor, M.D. on May 4, 1994. After his examination, Dr. Taylor wrote that he had found no evidence that Plaintiff suffers from any diagnosable psychiatric disorder and no evidence of any psychiatric functional limitations. Tr. at 474.

Plaintiff returned to The Headache & Pain Center on December 20, 1994 where she saw Steven D. Waldman, M.D. Dr. Waldman wrote: "Clinically, this patient has a recurrence of cervical radiculopathy, and may have a superimposed carpal tunnel syndrome." Dr. Waldman ordered an EMG, and a series of cervical epidural blocks. Tr. at 525. The same day, Plaintiff was seen by Howard J. Waldman, M.D. at Rehabilitation Physicians & Associates in Kansas City, Missouri, on December 20, 1994, where she underwent Nerve conduction Studies. Tr. at 494–496. According to Dr. Waldman, except for the possibility of "a very mild carpal tunnel syndrome" the tests were "essentially normal". Tr. at 495. Plaintiff underwent the epidural injections between December 20, 1994 and December 31, 1994. Tr. at 528–546. On December 31, 1994, Mark A. Greenfield, M.D., a doctor at The Headache & Pain Center, wrote that Plaintiff had "marked relief of her headache and upper extremity pain." Tr. at 542.

On June 15, 1994, Dr. Ghrist completed an Attending Physician Statement for American Mutual Life Insurance Company. Tr. at 497. On this form, Dr. Ghrist opined that Plaintiff has a "Class 5" physical impairment, which states: "Severe limitation of functional capacity; incapable of minimal (sedentary) activity. 75–100%." Tr. at 497.

In the opinion of the Court, the ALJ's hypothetical question (Tr. at 99) is supported by the opinion of the treating physician, Dr. Ghrist which was expressed in the letter to Disability Determination Services on April 18, 1994 (Tr. at 472), as well as the other medical opinions discussed below. In the April 18, 1994 letter, Dr. Ghrist stated that Plaintiff is unable to lift more than 10–15 pounds, the lifting restriction in the hypothetical.

The ALJ told the vocational expert to assume that Plaintiff would be unable to stand more than one hour at a time and no more than two to three hours out of an eight hour day, and that she would be unable to sit longer than an hour at a time, 5–6 hours a day, and that she is unable to walk more than a half hour at a time, one to two hours of an eight hour day. Tr. at 99. These restrictions are consistent with Dr. Ghrist's Functional Capacity Form which was submitted to Disability Determination Services in January, 1992. Tr. at 371. Although this assessment form was submitted in conjunction with a prior application which was not re-opened, the Court considers the doctor's opinion relevant to the current proceeding. There is no evidence that Plaintiff's medical condition changed dramatically between 1992 and the time the ALJ made his decision. This was also the only time that Dr. Ghrist was asked to opine regarding the actual length of time Plaintiff is able to stand, walk, sit, lift, etc. etc..

The ALJ stated that Plaintiff should not work at a job that required repetitive bending, stooping, squatting, kneeling or crawling. Tr. at 100. Dr. Ghrist said that Plaintiff "should avoid prolonged activity such as stooping, climbing, kneeling. Frequent changes in position are recommended." Tr. at 472, and 371.

On May 29, 1992, Thomas A. Carlstrom, M.D., in a letter to Plaintiff's attorney, said

that Plaintiff should avoid "turning her head rapidly such as driving a car, and so forth." Tr. at 352. The ALJ told the vocational expert that Plaintiff should avoid repetitive rapid turning of her head, The ALJ also said that Plaintiff should not work at unprotected heights, or use her arms above shoulder level. Tr. at 100.

■ The Attending Physician's Statement form filled out by Dr. Ghrist for American Mutual Life Insurance Company, on June 15, 1994, (Tr. at 497) would, at first glance, seem to contradict the opinion rendered to Disability Determination Services in April, and to detract from the substantiality of the evidence. The Court, however, is of the opinion that the ALJ was correct in giving more weight to the reports written at the request of Disability Determination Services. In the first place, when Dr. Ghrist wrote the letters of April 18, 1994, and January 16, 1992, he would have been well aware that his opinion regarding Plaintiff's functional limitations would be used to adjudicate her claim for disability benefits. In the second place, when there is a conflict in the evidence, it is for the ALJ to resolve. *Sebion v. Heckler*, 757 F.2d 960, 961 (8th Cir.1985). Furthermore, if, after reviewing the record, it is possible to draw two inconsistent positions from the evidence, the Commissioner's decision must be affirmed. *Ostronski v. Chater*, 94 F.3d 413, 416–417 (8th Cir.1996). In the opinion of the Court, the Attending Physician's Statement is not consistent with the evidence as a whole.

■ Plaintiff argues that the ALJ's hypothetical is deficient because it failed to include head dropping and blackouts. The Court disagrees. In the case of *Onstad v. Shalala*, 999 F.2d, 1232, 1234, 1235 (8th Cir. 1993) the Court wrote:

> A hypothetical question must completely describe a claimant's individual disabilities. *Bradley v. Bowen*, 800 F.2d 760, 763 (8th Cir.1986). This does not mean that the hypothetical must include all of the impairments a claimant alleges. It is required to include only those impairments that the ALJ finds actually exist, and not impairments the ALJ rejects—assuming, of

course, that the ALJ's findings are supported by substantial evidence.

Although Plaintiff testified before the ALJ that she suffered blackout spells when her head dropped, mention of this affliction is conspicuously absent from any of the treatment records of the doctors Plaintiff has seen over the years. Dr. Ghrist did not mention anything about head dropping or blackouts in any of the reports he wrote for Disability Determination Service or for insurance companies. The doctor did mention, it will be recalled, in his letter of April 1, 1993 (Tr. at 354) that Plaintiff "often suffers a *mild fall* with even simple bending over." (Emphasis added). A mild fall with simple bending over does not come anywhere near head dropping and blacking out described by Plaintiff. In the hypothetical, the ALJ told the vocational expert that Plaintiff would need to avoid work at unprotected heights. This is not a case of an ALJ rejecting a claimant's testimony because it is not supported by *objective* medical evidence, it is a case of testimony, on this aspect of Plaintiff's impairment, being rejected because of a lack of *any* supporting medical evidence. The ALJ made it clear that no one doubts that Plaintiff suffers from pain and work related limitations. Tr. at 22. As pointed out above, those impairments and limitations which were supported by the record as a whole were included in the hypothetical. The Court finds no fault with the ALJ's hypothetical.

In addition to asking if the limitations in the hypothetical were supported by the medical records and opinion, the Court also searched the record for limitations in the medical record which were not included in the hypothetical. The Court found none.

In this case, the Commissioner met his burden of proving, with medical evidence, that Plaintiff has a residual functional capacity for work. The Commissioner also proved, with vocational expert testimony, that jobs exist that Plaintiff is able to perform.

Plaintiff's Motion To Reverse The Commissioner is denied. The Commissioner's Motion To Affirm is granted.

The decision of the ALJ, which became the final decision of the Commissioner, is affirmed.

1. President Clinton appointed Kenneth S. Apfel to serve as Acting Commissioner of Social Security, effective September, 29, 1997, to succeed John J. Callahan. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Kenneth S. Apfel is hereby substituted for John J. Callahan as defendant in this action.